FRIEDLANDER, Judge,
concurring in part and dissenting in part.
I believe the trial court applied the correct standard in determining that IBM did not materially breach the Master Services Agreement (MSA). I therefore respectfully dissent from the portion of the Majority’s opinion that holds to the contrary. As a result, I also dissent from the resultant reversal of the trial court’s award of early termination closeout payments to IBM in the amount of $2.6 million. Upon my conclusion that IBM did not materially breach the MSA, I also believe that service investment fees are recoverable in the amount of $20.8 million, as are transition fees. I would remand to the trial court for determination of the appropriate amount of transition fees. I agree with the Majority in all other respects, namely that IBM is entitled to $40 million in assignment fees, $9.5 million in equipment fees, and fees associated with Change Orders 119 and 133, but is not entitled to prejudgment interest and fees associated with Change Orders 71 and 102.
My primary point of disagreement with the Majority concerns the standard to be employed in deciding whether IBM’s breach was “material”. According to § 16.3.1(1)(A) of the MSA, in order to terminate the MSA for cause, the State was required to prove a breach by IBM that was “material considering this Agreement as a whole”. Appellant’s Appendix at 692. As I believe the very language of this provision suggests it should, the trial court employed a balancing test in which it considered IBM’s failures in the context of the entirety of its obligations under the MSA. The Majority concluded this was error. In so doing, I believe the Majority inaccurately describes the test applied by the trial court as “balancing the number of benefits the State received versus the number of performance standards IBM failed.” Op. at 718. Described in this fashion, it sounds as though the trial court merely performed a mathematical calculation whereby it compared the benefits realized by the State to IBM’s breaches. I believe the trial court’s analysis was much more thorough and nuanced than that.
As a general matter, whether a breach is material is a question of fact to be decided by the trier of fact. Ream v. Yankee Park Homeowner's Ass’n, Inc. 915 N.E.2d 536 (Ind.Ct.App.2009), tram, denied. In making that determination, as the Majority notes, the trier of fact generally considers five factors, including: (1) the extent to *748 which the injured party will be deprived of a reasonably expected benefit; (2) the extent to which the injured party can be compensated for the deprived benefit; (3) the extent to which the party failing to perform will suffer forfeiture; (4) the likelihood of curing the failure taking into account all of the circumstances, including reasonable assurances; and (5) the extent to which the failing party’s performance comported with standards of good faith and fair dealing. Id. I believe that this test is at odds with, and superseded by, the test that the MSA specifies should be applied in this circumstance.
The MSA provided that the performance of services under its provisions would conform to the following standard:
Vendor will ensure that the Services will be performed and delivered in a manner that (i) meets or exceeds the required levels of performance, including the Performance Standards specified in or pursuant to this Agreement, (ii) is effective, efficient and courteous to the Clients, and (iii) uses Commercially Reasonable Efforts to support the State’s achievement of its Policy Objectives.
Appellant’s Appendix at 591. According to the MSA, IBM’s performance would be evaluated against the following performance goals identified for IBM in the MSA:
(1) Adherence to all the terms of this Agreement, including all covenants, obligations, representations and warranties;
(2) Performance in accordance with and compliance with the Modernization Project work plans, schedules, and milestones agreed to by the Parties;
(3) Performance of the Services in accordance with all applicable requirements of this Agreement, including the Performance Standards set forth in Schedule 10 [Performance Standards];
(4) Satisfactory results of Audits by the State, its representatives, or other authorized Persons in accordance with Art. 9 (with all results of such Audits being addressed in accordance with the Government’s Plan);
(5) Attendance at and participation in the DFR financial review and other meetings conducted from time to time by FSSA (both internally and with the public);
(6) Timeliness, completeness, and accuracy of required reports;
(7) Determination by the State of (i) Vendor’s satisfactory performance of the Services and the Delegated Activities, and (ii) Vendor’s satisfactory oversight and management of the Subcontractors; and
(8) Vendor’s effort to assist the State in achieving the Policy Objectives.
Id. at 591-92. The Majority cites, and presumably considers, these performance benchmarks in its analysis of the materiality question, but does so in a manner that rejects the trial court’s “balancing” methodology. In so doing, I believe the Majority effectively subjugates the MSA’s expressed test for materiality in favor of the general test set out in Collins v. McKinney, 871 N.E.2d 363 (Ind.Ct.App.2007). I believe the trial court got it right on this point.
The MSA itself requires evaluating a breach for materiality by considering it vis-a-vis the MSA “as a whole.” Appellant’s Appendix at 692. Indeed, it seems to me that performance under a contract of this breadth and complexity, whose goals and desired outcomes include some that are not susceptible to quantitative measurement, can be measured only in this manner, i.e., by considering the nature and extent of the nonconforming performance in the context of the entirety of what *749 is required under the contract. The Majority’s approach, on the other hand, permits a finding of material breach, with the attendant harsh results to the breaching party, upon the finding of “any breach [that] went to the essence of the contract”, which is to say in the present case any breach that affects the provision and expansion of access to services for welfare recipients in a timely, reliable, and efficient manner. It seems to me that, in view of the scope and breadth of the services IBM was required to perform under the contract, such a vigorous definition of “material breach” doomed from the beginning IBM’s effort to avoid committing a material breach.
As the Majority aptly notes, we will not set aside findings or a judgment unless they are clearly erroneous. Ind. Trial Rule 52(A). A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. Farmers Mut. Ins. Co. of Grant & Blackford Cnties. v. M Jewell, LLC, 992 N.E.2d 751 (Ind.Ct.App.2018), trans. denied. In announcing its conclusion and applying the test for material breach described above, the trial court explained its conclusion that IBM had not materially breached the contract, as follows:
Looking at the whole contract and IBM’s whole performance, at least substantial performance is clearly shown as a matter of law. The State’s case extrapolates from a number of general examples of frustrated welfare applicants and State workers, even attempts to estimate from data that as many as 80,000 or more applications (out of 1 million) were processed late during the 12 measured months of IBM’s management. Taken as true, these examples still have to be balanced against the whole contract and IBM’s whole performance showing benefits to the State and adhering to MSA policy objectives. Accordingly, the heart of the contract remained intact, although sometimes beating irregularly.
Appellant’s Appendix at 210.
The trial court noted that the State’s main argument in favor of material breach focused on Schedule 10 timeliness metrics. The court noted that this metric was not identified in the MSA as more important than nineteen of twenty-four KPIs that IBM consistently met. The Majority disapproves of this approach to the question of whether IBM materially breached the contract, explaining:
Contrary to the trial court’s implication in Conclusion No. 100, whether IBM materially breached the contract does not require balancing the number of benefits the State received versus the number of performance standards that IBM failed. Rather, the issue is whether any breach went to the essence of the contract — to provide and expand access to services for welfare recipients in a timely, reliable, and efficient manner within federal guidelines, to discourage fraud, and to increase work-participation rates.
Op. at 718. The Majority thus holds that materiality does not depend upon the scope of the breach relative to the entire contract. Rather, it concludes that a breach is material if it “went to” the provision and expansion of access to services for welfare recipients in a timely, reliable, and efficient manner. Id. Considered in isolation and not placed in context, this seemingly means that if there is a single problem concerning a prospective welfare recipient’s receipt of welfare benefits, at least with respect to gaining access to benefits in a timely, reliable, and efficient manner, then IBM is guilty of material breach. A standard that discounts context in this manner is too harsh.
*750 Additionally, the Majority concludes that the trial court erroneously failed to consider the State’s dissatisfaction with IBM’s performance in determining whether a material breach had occurred. I believe this mischaracterizes the trial court’s analysis. In fact, the trial court noted there was evidence that the State was dissatisfied with aspects of IBM’s work. For instance, the trial court noted that “the State’s level of satisfaction is one of eight enumerated ways in which IBM’s performance will be judged.” Appellant’s Appendix at 51. Thus, it is clear to me that the trial court did consider the State’s dissatisfaction in making its determination with respect to whether the material breach had occurred. Perhaps, the Majority’s rejection of the trial court’s judgment in this matter was not based upon the trial court’s utter failure to consider the State’s dissatisfaction, but instead based upon the weight accorded that factor in the trial court’s analysis. Regardless, I believe the trial court did consider this factor, and weighed it appropriately under the balancing test it correctly employed.
The Majority concludes that the trial court committed “flat error” in “treating ... liquidated-damages payments as the State’s exclusive remedy!.]” Op. at 720. I cannot agree that the trial court regarded the liquidated-damages payments in this manner. Rather, the trial court noted IBM’s shortcoming with respect to the timeliness metrics and indeed labeled it a “breach.” See Appellant’s Appendix at 49, Finding of Fact No. 105. The question is, was this breach “material”? The trial court concluded it was not, based largely upon the fact that, per the contract, the State was compensated for those breaches, explaining:
[T]hat was also the contemporaneous understanding of the State’s OV & V contract compliance organization and lead outside. As First Data’s Sanjay Vaze testified, ‘if timeliness was not met in a given month but IBM paid the liquidated damage, then as far as [First Data was] concerned, that was technically not a contractual breach.’ Similarly, as the State’s James Maxwell acknowledged, ‘IBM could perform under the contract by paying the contractual penalty if it was out of ... spec on any of the performance measures.’
Appellant’s Appendix at 50. I do not interpret this as indicating that the trial court viewed the liquidated damages payments as the State’s exclusive remedy for a breach of this sort. Instead, the court found that, “based on the complete record in this case ... the Coalition’s failures to meet certain Schedule 10 metrics did not constitute a breach of the MSA, in light of IBM’s payment of liquidated damages.” Id. (emphasis supplied). In other words, the trial court concluded that, in the context of the extensive and varied services IBM was required to perform under the MSA, the extent and frequency of its failure to meet the timeliness metric was simply not a material breach. I agree with that assessment.
This conclusion, in turn, requires me to address an issue presented upon cross-appeal by IBM. The MSA contained a deferred fees provision that distributed payments over a term of years for unam-ortized balances due to IBM. Labeled “service investment fees” by the parties, this constituted deferred compensation for work IBM and its subcontractors performed in the early stages of the project by spreading the cost over the life of the contract. This was done to address budgetary concerns that arose because at least two years of the modernization project were unaffordable, given the State’s budgetary constraints. IBM sought these fees in the trial court. The trial court refused to award service investment fees *751 based upon its conclusion that those deferred fees were designed to “prevent a future breach” and thus were not reasonably related to any harm suffered by IBM. Appellant’s Appendix at 225. As a result, the court concluded that the service investment fees sought by IBM amounted to an unenforceable penalty.
To the contrary, the fees that were the subject of the service-investment-fees provision in the MSA had already been earned at the time of the lawsuit. The MSA provided that, in the event of termination, the State would pay the unamortized balance of the deferred fees to IBM. The MSA did not associate either the payment of deferred fees or the date those payments were due with a breach of the MSA. Thus, in my view, the trial court erred in declining to order the State to pay the deferred fees requested by IBM.
Similarly, the MSA specified that IBM was entitled to fees associated with the transition from the system in place before this contract was executed to the system IBM would put in place. As was the case with the service investment fees, these fees had already been earned at the time this dispute arose. Accordingly, I believe the trial court erred in declining to order the State to pay the transition fees.
In summary, I agree with the Majority that IBM was entitled to assignment fees and equipment fees, as determined by the trial court. I agree that IBM was entitled to fees associated with Change Orders 119 and 133, but not entitled to fees associated with Change Orders 71 and 102. I also agree that IBM was not entitled to prejudgment interest. Upon my conclusion that IBM did not materially breach the contract, however, I believe IBM was entitled to transition fees and $20.8 million in service investment fees, and I would affirm the trial court’s award of $2.6 million in early termination closeout payments. Accordingly, I would remand this cause to the trial court to determine the amount of transition fees and the fees associated with Change Orders 119 and 133.